# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| FIRSTMERIT BANK, N.A., | ) |
| Plaintiff, | ) |
| v. | ) No. 15-cv-9238 |
| | ) Judge Ronald A. Guzmán |
| BMO HARRIS BANK and MICHELLE EDMONDS, | ) |
| Defendants. | ) |

## MEMORANDUM OPINION & ORDER

The Court grants Defendants' motions to dismiss [17] [26]. This case is dismissed without prejudice, and all pending motions/deadlines are terminated as moot.

## STATEMENT[1]

This case concerns the alleged fraudulent notarization of loan agreements between plaintiff FirstMerit Bank ("Plaintiff") and two borrowers, Tefik and Burum Menetti ("the Menettis"). The notary is defendant Michelle Edmonds ("Edmonds"); the bank she worked for is defendant BMO Harris Bank ("BMO") (collectively "Defendants").

Plaintiff's principal allegations are that Edmonds fraudulently notarized the Menettis' signatures on two forbearance agreements despite them never appearing before her, and that BMO was complicit in Edmonds' behavior. (Compl. [Dkt. # 1] at ¶¶ 1, 30-34, 40-52). But understanding the significance of this requires some background on the relationship between Plaintiff and the Menettis.

In 2010, Plaintiff acquired certain assets of Midwest Bank and Trust (now defunct) through the Federal Deposit Insurance Corporation. (*Id.* ¶¶ 7-8.) Within those assets were

---
[1] The following facts are derived from the allegations in the complaint [Dkt. # 1].

various mortgage loans made to the Menettis.[2] (*Id.* ¶ 8.) Roughly a year later, Plaintiff and the Menettis signed a Cross-Collateralization and Cross-Default Agreement ("the Modification Agreement"), which carried two significant consequences: (1) the Menettis' individual properties would serve collectively as collateral for all of the loans, and (2) a default of one loan meant a default on all. (*Id.* ¶ 11.) Unfortunately, the loans went into default in 2012, thus prompting Plaintiff to file two lawsuits to foreclose on the corresponding properties: *FirstMerit Bank, N.A., et al vs. 2200 North Ashland, LLC, et al.*, No. 1:12-cv-00572 (N.D. Ill.), and *FirstMerit Bank, N.A., et al vs. First S & H Management, LLC, et al.*, No. 1:12-cv-00580 (N.D. Ill.). (*Id.* ¶ 9.) Both cases were soon withdraw, however, because the parties executed two forbearance agreements (the "Forbearance Agreements"), according to which Plaintiff agreed not to exercise its rights under previous loan agreements in exchange for certain guarantees. (*Id.* ¶ 10; *see also* Forbearance Agreements [Dkt. # 1, Exs. 1, 2].) Those guarantees were (1) an affirmation that the prior loans were in default, and (2) a stipulation that the Menettis had no defenses to the enforcement of the defaulted loans. (*Id.* ¶¶ 11-12.) In other words, the Menettis would get more time to pay what they owed, while Plaintiff would, in theory, have an easier case to litigate should the Menettis decide not to pay.

As it happens, the Menettis didn't pay, and Plaintiff accordingly reinstated one of its foreclosure lawsuits against them, this time with the added leverage of the Forbearance Agreements. *See FirstMerit Bank, N.A., et al vs. 2200 North Ashland, LLC, et al.*, No. 1:12-cv-00572 (N.D. Ill.) ("the Foreclosure Action"). But Plaintiff soon faced an unexpected wrinkle: the Menettis responded in the Foreclosure Action by claiming that their signatures on the Forbearance Agreements were forged. (Compl. ¶¶ 18-23.) As such, Plaintiff has thus far been

---

[2] Technically, there were six loans made to various limited liability companies owned by Tefik, Burum, and four other Menetti family members, but only Tefik and Burum are relevant to the instant motion.

unable to recover the amounts due under the loans, a problem that it now attributes to Defendants. (*Id.*)

Particularly, Plaintiffs allege that Edmonds violated the Illinois Notary Public Act ("NPA"), 5 Ill. Comp. Stat. § 312/7-101, by falsely certifying that the Menettis appeared before her and signed the forbearance agreements (Count I), and that BMO similarly violated the NPA by consenting to Edmonds' conduct within the meaning of NPA Section 7-102, 5 Ill. Comp. Stat. § 312/7-102 (Count II). In addition, Plaintiff further alleges that Edmonds and BMO conspired to defraud Plaintiff (Counts III and IV). Defendants now move to dismiss the complaint in its entirety, claiming that the Court lacks jurisdiction and that the allegations in the complaint fail to state a claim.

## **LEGAL STANDARD**

For purposes of a motion to dismiss under either Rule 12(b)(1) or Rule 12(b)(6), the court accepts as true all well-pleaded factual allegations and construes all reasonable inferences in the plaintiff's favor. *Scanlan v. Eisenberg*, 669 F.3d 838, 841 (7th Cir. 2012). To survive a Rule 12(b)(6) motion, the complaint must set forth a "'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (citations omitted). A Rule 12(b)(1) motion, in contrast, challenges federal jurisdiction, and the plaintiff bears the burden of establishing that the elements necessary for jurisdiction have been met, such as standing and ripeness. *Scanlan*, 669 F.3d at 841-42. In ruling on a 12(b)(1) motion, the court may look outside of the complaint's allegations and consider whatever evidence has been submitted on the issue of jurisdiction. *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995).

**DISCUSSION**

I.  **Subject Matter Jurisdiction**

Defendants present two interrelated jurisdictional challenges: ripeness and standing. They claim that viability of Plaintiff's injury in this case is contingent upon the resolution of the Foreclosure Action, and they are largely correct.

To invoke federal jurisdiction, a plaintiff must present a "case or controversy" within the meaning of Article III of the Constitution. *See Smith v. Wisconsin Dep't of Agric.*, 23 F.3d 1134, 1141 (7th Cir. 1994). This requirement involves two distinct inquires — standing and ripeness. *Id.* Standing exists when the plaintiff suffers an actual or impending injury, no matter how small; when that injury is caused by the defendant's acts; and when a judicial decision in the plaintiff's favor would redress that injury. *Brandt v. Village of Winnetka*, 612 F.3d 647, 649 (7th Cir. 2010). Ripeness, in contrast, addresses two factors: (1) whether the relevant issues are sufficiently focused so as to permit judicial resolution without further factual development; and (2) whether the parties would suffer any hardship by the postponement of judicial action. *Triple G Landfills, Inc. v. Bd. of Comm'rs*, 977 F.2d 287, 288-89 (7th Cir. 1992). While the two doctrines are distinct, they nonetheless overlap substantially, especially in cases where, as here, the existence of an injury is questionable. *See Smith*, 23 F.3d at 1141 ("It is sometimes argued that standing is about *who* can sue while ripeness is about *when* they can sue.") (emphasis in original; citation and quotations omitted); *Wis. Right to Life State PAC v. Barland*, 664 F.3d 139, 149 (7th Cir. 2011) (explaining that Article III standing is a constitutional threshold matter, whereas ripeness is a mix of both constitutional and prudential concerns). For the sake of analytical clarity, however, the Court will frame its discussion in terms of ripeness.

A.  **Ripeness**

   (i) *Fitness for Review*

The critical question concerning fitness for review is whether the claim involves uncertain events "that may not occur as anticipated, or [may] not occur at all." *Capeheart v. Terrell*, 695 F.3d 681, 684 (7th Cir. 2012). Encompassed within this inquiry are sub-issues such as the finality of the issue presented for review, the definiteness of the threat of harm, and the extent to which resolution of the matter depends on facts not yet developed. *Id.; Wis. Right to Life State PAC v. Barland,* 664 F.3d 139, 148 (7th Cir. 2011). Each of these concerns dictates that this case is unfit for review.

Above all, the facts surrounding Plaintiff's alleged injury are fraught with contingency. As explained in the complaint, Plaintiff claims to be unable to recover the amounts due under the loans because of Edmonds' fraudulent notarization, which facilitated the forgery that rendered the Forbearance agreement unenforceable, thereby causing "[d]amages in an amount in excess of $21,237,410.72, plus all pre-judgment interest accruing under the Loans." (Compl. ¶ 39). But the reality is that Plaintiff has not yet incurred those damages, and the proof of this lies in the Foreclosure Action, where Plaintiff is attempting to recover the funds from the Menettis (and others) on the theory that the loans are valid and enforceable. If the loans are indeed enforceable, and the Menettis signatures are found to be authentic, then it would seem that Plaintiff suffered no injury from Defendants' alleged misconduct, which means the injury presently alleged is contingent in nature.

Plaintiff's response to this shortcoming is unavailing:

> [The complaint] alleges that [Edmonds and BMO] notarized . . . [the Menettis' signatures] on the forbearance agreements [despite them not appearing before Edmonds] . . . . [This] constitutes notarial misconduct under the Illinois Notary Public Act. . . .There is nothing contingent about [these allegations].

5

(Pl.'s Br. Opp'n [Dkt. # 36] at 5.). While Plaintiff is correct about the concreteness of the allegations of *misconduct*, they are only half of the picture. The meat and potatoes of the controversy — the damages — stem from the *consequences* of that misconduct. *See* 5 Ill. Comp. Stat § 312/7-101 ("A notary public . . . [is] liable . . . for *all damages caused by* the notary's official misconduct.") (emphases added); *Midwest Commerce Banking Co. v. Elkhart City Ctr.*, 4 F.3d 521, 526 (7th Cir. 1993) ("You cannot seek an award of damages for fraud . . . before the fraud has harmed you. . . . Even if there has been harm, if it cannot be quantified, a damages suit may still be premature.") (citations and quotations omitted); *W.A. Taylor & Co. v. Griswold & Bateman Warehouse Co.*, 742 F. Supp. 1398, 1407 (N.D. Ill. 1990) ("Illinois law requires that damages resulting from fraud must be *definite* and *not speculative*) (emphasis added). And as things now stand, it is unclear what damages will materialize in this case given the posture of the Foreclosure Action.

There, the Menettis are not only claiming that their signatures on the Forbearance Agreements were forged, but also that their signatures on the Modification Agreement were forged as well. The consequences of these defenses, as explained by the district court in the Foreclosure Action, are as follows:

> Because there is a disputed question of fact as to the signature of Tefik Menetti on both the 2011 Modification Agreement and the [Forbearance Agreement], there are disputed questions of fact as to the validity of both agreements. . . . If FirstMerit is not entitled to declare all of the properties in default pursuant to the [Modification Agreement], then FirstMerit may not be entitled to judgment of foreclosure and sale of all of the underlying properties nor to all of the damages it seeks. Even if FirstMerit is correct that the Forbearance Agreement ratified the [Modification Agreement] (an issue the Court is not deciding at this juncture), a forged signature on the Forbearance Agreement might negate the legal effect of that purported ratification.

*FirstMerit Bank, N.A. v. 2200 N. Ashland, LLC*, No. 12 C 572, 2014 WL 6065817, at *9 (N.D. Ill. Nov. 13, 2014). The contingencies surrounding the ultimate enforceability of the loans are therefore very much alive. Indeed, Plaintiff may even lose the Foreclosure Action (at least against the Menettis), and for reasons entirely unrelated to Defendants' alleged misconduct (such as the unenforceability of the Modification Agreement, or the other defenses put forth by the Menettis). Therefore, Plaintiff's alleged damages in this case are largely, if not entirely, contingent upon the outcome of the Foreclosure Action.

Undeterred, Plaintiff argues in its response brief that it has suffered concrete damages of a different sort: (1) "the additional attorney fees, taxes, and receiver expenses paid by [Plaintiff] because it forbore its right to enforce the loan documents" and (2) "the time and expense of litigating the enforceability of the forbearance agreement." (Pl.'s Br. Opp'n at 6, 9.) But even these "concrete" damages are contingent. If, for example, the underlying loans are found unenforceable because of deficiencies in the Modification Agreement, then the attorney's fees and taxes Plaintiff incurred by staying enforcement of those (unenforceable) loans via the Forbearance Agreement could be illusory. The same concerns exist regarding the receiver fees. *See FirstMerit Bank, N.A.,* 2014 WL 6065817, at *9 ("The potential failure of the cross-collateralization and cross-default provisions might also call into question the appointment of a receiver for all the properties back in April 2012."). Similarly, with respect to the enforcement of Forbearance Agreements, it is difficult to determine whether the cost of litigating this issue is necessarily attributable to Defendants: if the Menettis' signatures are found to be authentic, then most, or all, of the expenses incurred by Plaintiff would stem from the Menettis putting on a meritless defense rather than Defendants' alleged misconduct.[3]

---

[3] Plaintiff suggests at one point that it is no longer contesting the Menettis' claim that their signatures were forged, apparently in an attempt to rid the instant case of contingencies (*See* Pl.'s Br. Opp'n at 5.)

At bottom, the point is that the contours of this case depend largely on the outcome of the Foreclosure Action. In so holding, the Court is mindful that Plaintiff *may* have been deprived of *some* of the benefit of its bargain by virtue of Defendants' misconduct. But the fact remains that the relevant issues, particularly causation and injury, "are not sufficiently focused to permit judicial resolution without further factual development." *Triple G Landfills, Inc. v. Bd. of Comm'rs of Fountain Cnty., Ind.*, 977 F.2d 287, 289 (7th Cir. 1992). This case accordingly fits the mold of "unfit for review." *See Hartford Cas. Ins. Co. v. Borg-Warner Corp.,* 913 F.2d 419, 424 (7th Cir. 1990) (finding ripeness and standing problems in a case where "the amount and existence of [the plaintiff's] damages [were] dependent on the outcome of state proceedings, [making it] difficult for a federal court to determine whether [the plaintiff] has sustained any injury"); *Ciszewski v. Milas,* 871 F. Supp. 1065, 1068 (E.D. Wis. 1994) (dismissing as unripe a claim that "hinge[d] on the decision of the state court in . . . related actions"); *Lane v Stephenson*, No. 96 C 556, 1996 U.S. Dist. LEXIS 18346, at *9-11 (N.D. Ill. Dec. 4, 1996) (holding that certain minority shareholders' claims for fraud against other shareholders were unripe because those same minority shareholders filed a prior lawsuit seeking to obtain fair market value for their stock, which rendered the extent and existence of the alleged harm from the fraud-injury as contingent upon the resolution of the prior lawsuit).

    (ii)    *Hardship*

Turning to the second prong of the ripeness inquiry, "hardship" generally focuses on whether withholding judicial consideration would significantly affect a party's legal rights or

---

Yet Plaintiff does not cite to any record to support this claim, nor has the Court's review of the lengthy docket in the Foreclosure Action uncovered anything to suggest that the signature/authenticity issue has been resolved. In any event, the authenticity of the Menettis signatures is but one of the many contingent issues that need to be resolved in this case. The ultimate question is whether Defendants' misconduct caused Plaintiff any harm, and that will turn on whether and why the loan agreements are found to be unenforceable — an issue that extends beyond the validity of the Forbearance Agreements.

practically impair the party's asserted interests. *See Metro. Milwaukee Ass'n of Commerce v. Milwaukee Cnty.*, 325 F.3d 879, 882 (7th Cir. 2003); *see also* James W. Moore et al., Moore's Federal Practice - Civil, Vol. 15 § 101.76 (2015) ("The hallmark of cognizable hardship is usually direct and immediate harm"). Plaintiff has made no such showing here.

It simply states in a conclusory fashion that "the hardship to FirstMerit of withholding consideration of [the issues] in this action outweighs any hardship to BMO Harris and Edmonds" and that "it would be needlessly forestalled in proving its claims." (Pl.'s Br. Opp'n at 10-11.) But the "forestalling" here would not be needless at all. To the contrary, it would facilitate a determination of what, if any, damages were incurred, a point that Plaintiff all but admits:

> The foreclosure action is much further advanced than is the action before this court. . . . the court in the foreclosure action is set to establish deadlines for the filing of summary judgment motions and to schedule a trial date. The result is that, depending on the outcome of the validity and enforceability of the forbearance agreement, FirstMerit will be able to quantify its injury well before the action in this court is ready for determination.

(*Id.* at 10.) By deferring judgment, Plaintiff will, at worst, simply have to wait longer to pursue its claims, whereas Defendants could potentially avoid litigation altogether, or, at the least, be able to determine the gravity of this suit (i.e., whether they are on the hook for five months of attorney's fees or upwards of twenty million for the entirety of the loans). *See Ratajczak v. Beazley Sols., Ltd.*, No. 13-C-045, 2014 U.S. Dist. LEXIS 92400, at *12 (E.D. Wis. July 7, 2014) ("Defendants . . . should not be forced to bear the burdens of litigation without substantial justification, and in any event may find themselves unable to litigate intelligently if they are forced to grapple with hypothetical possibilities rather than immediate facts.") (citation omitted). As such, Plaintiff has not shown any impending injury or sufficient hardship that would militate against withholding judicial consideration of this case.

The Court therefore finds this case unripe. Whether this undermines the Court's jurisdiction or simply provides a prudential basis for dismissal,[4] the effect is the same: this case is dismissed without prejudice.

## **CONCLUSION**

For the reasons set forth above, the Court grants Defendants' motions to dismiss [17] [26]. This case is dismissed without prejudice, and all pending motions/deadlines are terminated as moot.

**SO ORDERED.**                                                        **ENTERED:  May 9, 2016**

_____
**HON. RONALD A. GUZMÁN**
**United States District Judge**

---

[4] *Compare Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 538 (7th Cir. 2006) ("[R]ipeness is peculiarly a question of timing rather than a [necessary] limit on subject-matter jurisdiction.") (citation and quotations omitted) *with Biddison v. City of Chicago*, 921 F.2d 724, 726 (7th Cir. 1991) ("[I]f the case is not yet ripe for purposes of article III, we should dismiss the case for lack of subject-matter jurisdiction.").